UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

RUTH ANN COOPER, D.P.M., *on behalf of herself and all others similarly situated*,

                               **Case No. 1:16-cv-945**

         **Plaintiff,**                    **JUDGE DOUGLAS R. COLE**

      **v.**

NEILMED PHARMACEUTICALS, INC.,

        **Defendant.**

## OPINION AND ORDER

Plaintiff Dr. Ruth Ann Cooper contends that Defendant NeilMed Pharmaceuticals, Inc., violated the Junk Fax Prevention Act of 2005 when it sent a fax offering product samples to over 50,000 recipients, including her. Seeking to vindicate her own rights, as well as the rights of all others who received the same fax, Dr. Cooper now moves the Court to certify this matter as a class action under Federal Rule of Civil Procedure 23. (*See* Mot. for Class Certification, Doc. 59). For the reasons explained more fully below, the Court finds that Dr. Cooper has failed to show predominance, and thus the Court **DENIES** Dr. Cooper's Motion for Class Certification (Doc. 59).

## BACKGROUND

The factual underpinnings of this dispute are straightforward. NeilMed Pharmaceuticals, Inc. ("NeilMed") is a purveyor of sinus rinses and other first-aid products. NeilMed sent a fax (the "P3990 Fax") to some 54,000 unique fax

numbers—numbers belonging mostly to physicians and physicians' offices—between August 24 and 25, 2016.[1] (Mot. for Class Certification ("Mot."), Doc. 59, #495–96). The P3990 Fax told recipients that NeilMed wanted to send them "product samples," and asked recipients to "verify [their] address and confirmation for samples" by filling in their contact information and faxing the form back to NeilMed. (*See* NeilMed Fax, Compl. Ex A, Doc. 1-1, #16). It also invited recipients to opt out of future faxes by checking a "remove my name" box and returning the fax. (*Id.*).

Less than a month after receiving the P3990 Fax, Dr. Cooper initiated this putative class action, alleging that NeilMed's transmission of the fax violated the Telephone Consumer Protection Act of 1991, as amended by the Junk Fax Prevention Act of 2005, 47 U.S.C. § 227 ("TCPA").[2] In broad terms—and as discussed more thoroughly below—that statute makes it unlawful "to send, to a telephone facsimile machine, an unsolicited advertisement." 47 U.S.C. § 227(C). Dr. Cooper contends that the P3990 Fax is just such an "unsolicited advertisement"; "unsolicited" because NeilMed did not obtain Dr. Cooper's "prior express invitation or permission" before sending it, and an "advertisement" because NeilMed directly

---

[1] NeilMed sent a first fax on August 24 to approximately 53,042 recipients. After a NeilMed employee realized the first fax contained an incorrect return fax number, NeilMed sent a substantially identical follow-up fax the next day to approximately 53,711 recipients. Dr. Cooper's proposed expert compared the fax logs from both transmissions and determined that, between the two, the P3990 Fax was successfully transmitted, in one version or another, to 54,938 unique fax numbers—the number the Court recites above. NeilMed does not dispute this method of calculating the putative class size, and thus the Court accepts it for purposes of this Opinion.

[2] Although this case focuses on the "Junk Fax" provisions of the TCPA added by amendment in 2005, the Court will refer to the statute generally as the "TCPA" for simplicity.

sells and profits from the products mentioned in the P3990 Fax. (*See* Compl., Doc. 1, #3–4); *see also* 47 U.S.C. § 227(a)(5) (defining "unsolicited advertisement").

Shortly after the action was filed, NeilMed moved to dismiss the Complaint for failure to state a claim. (*See* Doc. 14). The then-assigned Judge denied NeilMed's Motion in September 2017. (*See* Order, Doc. 27). That Judge then stayed the action for about 8 months in 2019, awaiting the outcome of a potentially relevant Supreme Court decision. After the court lifted that stay, Dr. Cooper filed this motion for class certification, seeking to certify a class of "[a]ll persons/entities who successfully received the P3990 Fax on August 24, 2016 or August 25, 2016 and have not signed a NeilMed Declaration." (Doc. 59, #512). NeilMed responded in opposition (Doc. 66) on April 21, 2020, and Dr. Cooper replied in support (Doc. 70) on May 8, 2020. The matter was transferred to the undersigned on November 20, 2020. The class certification motion is now fully briefed and before the Court.

## LEGAL STANDARD

The class action is a unique mechanism in civil litigation. It represents "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). To justify a departure from the named-parties-only rule, though, a putative class representative must make certain showings. Under Federal Rule of Civil Procedure 23(a), the named plaintiff(s) must show that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class;

3

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). These requirements— commonly known as numerosity, commonality, typicality, and adequacy—limit abuse of the class action mechanism by ensuring, among other things, that the class claims are "fairly encompassed by the named plaintiff's claims." *Wal-Mart*, 564 U.S. at 349 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).

But compliance with Rule 23(a) alone does not suffice to carry a case across the class-certification finish line. Rather, beyond satisfying Rule 23(a), the putative class must also comply with one of the provisions of Rule 23(b). Here, Dr. Cooper seeks certification under Rule 23(b)(3). (Mot., Doc. 59, #497). Rule 23(b)(3) is perhaps the most flexible of the 23(b) pathways, as it "allows class certification in a much wider set of circumstances" than (b)(1) or (b)(2). *Wal-Mart*, 564 U.S. at 362. This flexibility, however, is counterbalanced by "greater procedural protections." *Id*. These additional procedural protections are twofold.

First, under Rule 23(b)(3), the court must "find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members." This "predominance" inquiry is similar to, though "more stringent" than, Rule 23(a)(2)'s "commonality" requirement, with the former (i.e., predominance) said to "subsume[]" or "supersede[]" the latter (i.e., commonality). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997). In other words, "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)['s

commonality requirement]." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (citing *Amchem*, 521 U.S. at 623–24).

Second, the court must find that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This "superiority" requirement aims to "achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615 (quoting Fed. R. Civ. P. 23 adv. comm. n. to 1966 amend.).

Rule 23(b)(3) lists four non-exhaustive factors "pertinent" to the "predominance" and "superiority" analyses. Two are potentially relevant here—"the likely difficulties in managing a class action" and "the class members' interests in individually controlling the prosecution or defense of separate actions." *See* Fed. R. Civ. P. 23(b)(3)(A)–(D).

Importantly, the question of whether a class may be appropriately certified is separate from whether the putative class, as defined, will succeed on the merits. That said, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Comcast*, 569 U.S. at 33 (quoting *Wal-Mart*, 564 U.S. at 350). Indeed, the Supreme Court has directed courts to undertake a "rigorous analysis" before certifying a class—an analysis that "frequently entail[s] 'overlap with the merits of the plaintiff's underlying claim.'" *Id.* at 33–34 (quoting *Wal-Mart*, 564 U.S. at 350). While this "rigorous analysis" might involve *some* consideration of the merits, though, courts do not have "license to engage in free-

5

ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

At bottom, a "district court has broad discretion to decide whether to certify a class. [The Sixth Circuit] has described its appellate review of a class certification decision as 'narrow,' and as 'very limited.'" *Glazer v. Whirlpool Corp.* (*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*), 722 F.3d 838, 850 (6th Cir. 2013) (citations omitted).

## LAW AND ANALYSIS

As described above, Dr. Cooper must clear six hurdles to succeed in her motion for class certification: Rule 23(a)'s requirements of numerosity, commonality, adequacy, and typicality, as well as Rule 23(b)(3)'s requirements of predominance and superiority.[3] Of these, NeilMed meaningfully contests only three: adequacy and typicality under Rule 23(a), and predominance under Rule 23(b)(3). Because the Court concludes that the predominance inquiry is dispositive, it begins and ends its analysis there.

---

[3] Rule 23(b)(3) also contains an "implied ascertainability" requirement. *See Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 471 (6th Cir. 2017) ("[A] 'class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class.'" (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537–38 (6th Cir. 2012)). In the Junk Fax context, the Sixth Circuit has generally considered fax logs listing transmission recipients—which are available in this case—to satisfy the requirement. *See id.*

**A.     Dr. Cooper Has Failed To Demonstrate That Common Issues Of Fact Or Law Would Predominate Were This Case To Proceed To Trial As A Class Action.**

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 544 (6th Cir. 2012) (quoting *Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347, 352–53 (6th Cir. 2011)). But "[a] plaintiff class need not prove that each element of a claim can be established by classwide proof." *Whirlpool Corp.*, 722 F.3d at 858 (citing *Amgen*, 568 U.S. at 468). Indeed, "[a] class may be certified based on a predominant common issue even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 460 (6th Cir. 2020) (citation and internal quotation marks omitted).

In deciding whether individual issues predominate over common questions, a court cannot rely on mere "speculation and surmise" that individual issues may arise. *Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1125 (6th Cir. 2016) (quoting *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000)). Instead, a court "should consider only those issues that would *likely* arise if an individual class member's claims were being adjudicated on the merits." *Bais Yaakov of Spring Valley v. ACT, Inc.*, 12 F.4th 81, 89 (1st Cir. 2021) (emphasis

added). "In so doing, a court considers 'the probable course of the litigation' so as to 'formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate.' *Id.* (quoting *Mowbray*, 208 F.3d at 298); *see also Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 468 (6th Cir. 2017) ("[T]he key is to 'identify[] the substantive issues that will control the outcome,' in other words, courts should 'consider how a trial on the merits would be conducted if a class were certified.'" (quoting *Gene & Gene, LLC v. BioPay, LLC*, 541 F.3d 318, 326 (5th Cir. 2008)).

NeilMed argues Dr. Cooper has failed to establish the predominance required by Rule 23(b)(3) for two reasons. First, it argues that many of the putative class members have, in one way or another, consented to receiving faxes similar to and including the P3990 Fax, thereby defeating any TCPA claim based on unsolicited advertisement as to that putative class member. (Mem. in Opp'n to Mot. for Class Certification ("Opp'n"), Doc. 66, #1546). In NeilMed's view, identifying which individuals gave permission on the facts here is an "inherently individualized" inquiry, "essentially requir[ing] a mini-hearing on the merits of each case." (*See id.* at #1548). Second, NeilMed argues that "individual issues as to what type of equipment class members used to receive faxes will predominate over common issues." (*Id.* at #1554). Identifying the equipment used by each putative class member is critical, according to Neilmed, because "online fax service[s] that effectively receive[] faxes 'sent as email over the Internet' … fall[] outside the scope of the [TCPA's] statutory prohibition." (*Id.*). Because the Court concludes that

8

NeilMed succeeds on the first of these two arguments, the Court declines to consider the latter.

> **1.  NeilMed Has Adduced Sufficient Evidence Supporting Its Affirmative Defense Of Prior Express Invitation Or Permission, And Dr. Cooper Has Failed To Offer Generalized Proof To The Contrary.**

NeilMed argues mainly that the Court should deny class certification because individual issues relating to consent will overwhelm issues common to the class.

That argument starts on strong legal footing, as consent is integral to determining NeilMed's TCPA liability. The TCPA, as amended by the Junk Fax Prevention Act, makes it unlawful to "send … an *unsolicited* advertisement" unless certain conditions are met. 47 U.S.C. § 227(b)(1)(C) (emphasis added). An "unsolicited advertisement" is an advertisement "which is transmitted to any person without that person's prior express invitation or permission." *Id.* § 227(a)(5). Though the invitation or permission must be "express," the Act explains that it may be provided "in writing or otherwise," *id.*, which includes oral permission. *See Sawyer v. KRS Biotechnology, Inc.*, No. 1:16-CV-550, 2018 WL 2425780, at *11 (S.D. Ohio May 30, 2018), *report and recommendation adopted sub nom. Sawyer v. KRS Glob. Biotechnology, Inc.*, No. 1:16-CV-550, 2018 WL 4214386 (S.D. Ohio Sept. 5, 2018) ("[P]ermission to send fax advertisements may be 'granted in writing or orally.'" (quoting Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005, 71 Fed. Reg. 25967, 25971)). Thus, any person who expressly invited the P3990 Fax does not have a viable TCPA claim against NeilMed, whether or not the fax was an "advertisement."

9

While consent is an important issue to liability, the question at the certification stage is limited to whether the consent issue prevents Dr. Cooper from showing *predominance*. The Court's consideration of that issue begins with a threshold matter—identifying which party bears the burden of proof at this stage of litigation and then considering how that burden affects the predominance analysis.

The parties nominally disagree both on where to place the burden of proof and the practical effect of that placement, but their disagreement is more in tone than substance. Both parties ultimately agree (or at least do not seriously dispute) two propositions. This first of these, is that, as the party seeking certification, Dr. Cooper retains the burden of establishing that Rule 23(b)(3)'s requirements are met—which includes the need to show that "questions of law or fact common to class members predominate over" questions affecting only individuals. *See Sandusky Wellness*, 863 F.3d at 466–67 ("It is the party seeking class certification … that bears the burden of 'affirmatively demonstrat[ing]' compliance with Rule 23." (quoting *Wal-Mart*, 564 U.S. at 350)). And the second is that, on the merits of consent, NeilMed shoulders the burden of proving prior express invitation or permission because consent is an affirmative defense to TCPA liability. *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018) ("'[E]xpress consent' is an affirmative defense to a claim brought under a provision of the TCPA dealing with unsolicited telephone calls, and [] the defendant bears the burden of

proving such consent.").[4] Given the absence of serious dispute, the Court allocates these respective burdens as the parties suggest.[5]

So what are the practical implications of that conclusion? The parties again appear to disagree on the answer to that question. But, again, the disagreement is largely superficial. Dr. Cooper, citing the Ninth Circuit's opinion in *True Health*, asserts that, because NeilMed "has the burden of proof on the permission defense, this Court must consider [only] the permission defenses for which NeilMed has actually presented evidence." (Reply, Doc. 70, #53324). For its part, NeilMed contends that the burden of establishing prior express invitation or permission is "irrelevant" to the class certification question, but then concedes that *True Health* held that a defendant must "actually advance[]" a consent defense and present "evidence supporting it." (Opp'n, Doc. 66, #1553).

The upshot of all that is this: at the certification stage, the Court may only consider theories of consent NeilMed "has actually advanced and for which it has presented evidence," which it may do "in various ways." *True Health*, 896 F.3d at 931–32 (citing *Sandusky Wellness*, 863 F.3d at 468–70). Conversely, the Court may not consider "consent defenses that [NeilMed] *might* advance or for which it has presented *no* evidence." *Id.* (emphasis added) (citing *Top Flite*, 843 F.3d at 1125).

---

[4] NeilMed offhandedly suggests that categorizing prior express permission as an affirmative defense is erroneous "under basic principles of statutory interpretation," (Opp'n, Doc. 66, #1552), but it does not develop that argument any further, and the Court declines to entertain it for purposes of this Opinion.

[5] The Court will refer to NeilMed's affirmative defense variously as "consent" "permission" and "prior express invitation or permission."

The parties needn't have cited out-of-circuit precedent for that point, though, as it follows directly from Sixth Circuit case law. Indeed, the Ninth Circuit's *True Health* decision, on which the parties rely, cites to Sixth Circuit precedent. *See id.* In fact, the Sixth Circuit has considered this precise issue—whether and when individualized questions of consent will preclude class certification in the TCPA context—on two occasions. In one, it found class certification appropriate, and in the other, it did not. In many ways, resolving the instant class certification motion turns largely on determining which of those two cases is a better fit to the facts here. Thus, the Court begins with a closer look at each.

First, in *Bridging Communities Inc. v. Top Flite Financial Inc.*, 843 F.3d 1119 (6th Cir. 2016), the defendant, Top Flite, had paid a third-party "fax-blasting" service to send advertisements to more than 4,000 fax numbers; the third party had in turn purchased these fax numbers from yet another company. *Id.* at 1122. In resisting class certification, the defendant argued that the affirmative defense of consent would raise individualized factual inquiries that would overwhelm issues common to the class—that is, the defendant argued that, because consent is an individualized issue, plaintiff could not establish predominance as Rule 23(b)(3) requires. But the defendant did not offer any evidence to support the argument that resolving consent would require individualized determinations. Rather, it merely "raised the possibility" that some "class members *might* have given consent." *Id.* at 1125.

12

The Sixth Circuit rejected that argument, noting that "mere mention of a defense is not enough to defeat the predominance requirement of Rule 23(b)(3)." *Id.* at 1126. Further, "speculation and surmise" about a possible consent defense did not create a lack of predominance. *Id.* Rather, the court agreed with the plaintiff that, on the facts at issue, the question of consent was subject to generalized proof. In particular, because the "sender 'obtained all of the fax recipients' fax numbers from a single purveyor of such information[,]' there exist[ed] a 'class-wide means of establishing the lack of consent based on arguably applicable federal regulations.'" *Id.* at 1126. Those regulations required the third-party sender to "take reasonable steps to verify that the recipient agreed to make the number available for public distribution." *Id.* at 1125 (quoting 47 C.F.R. § 64.1200(a)(4)(ii)(B)). In light of those regulations, the "common question" about prior consent was "whether the inclusion of the recipients' fax numbers in the purchased database indicated their consent to receive fax advertisements." *Id.* at 1126 (quoting *Gene & Gene*, 541 F.3d at 328). Framed that way, "there [we]re … no questions of individual consent.'" *Id.*

A year after *Top Flite*, though, the Sixth Circuit held that "*individualized* questions of consent" *can* "prevent[] common questions from predominating." *Sandusky Wellness*, 863 F.3d at 466. Although the *Sandusky* defendant had (like the *Top Flite* defendant) purchased a list of contacts from a third-party data provider, the *Sandusky* defendant later learned that some of the purchased contacts "happened to be current or former customers." *Id.* at 464–65. And in response to the motion for class certification, the defendant produced 450,000 pages of various

13

forms, some of which the district court found "would demonstrate that these customers … had given the requisite consent … to receive the fax." *Id.* at 468.

Faced with these facts, the Sixth Circuit reasoned that, if the "class were certified, the district court would be tasked with filtering out those members to whom [the defendant] was not liable—those individuals who solicited the … fax." *Id.* at 468. And, in distinguishing the case before it from *Top Flite*, the court noted that, unlike the plaintiff in *Top Flite*, the *Sandusky* plaintiff had not advanced a viable theory of generalized proof demonstrating the *absence* of consent. *Id.* at 469–70. Rather, although the case involved some questions common to the class, "identifying which individuals consented would undoubtedly [have been] the driver of the litigation." *Id.* at 468.

Reading the two cases together, then, the rule appears to be something along these lines: A defendant's bare assertion that some of the putative class members may have consented does not preclude class certification. But if the defendant is able to offer some evidence supporting a consent defense, especially if the defendant can do so as to a significant number of putative class members, and the plaintiff fails to offer a viable class-wide mechanism for resolving the issue, that can preclude certification.

The problem in applying that rule here, though, lies in determining how much evidence the defendant must produce regarding consent, and how large the number of putative class members must be, for the defendant to take advantage of that rule. And on that front, *Top Flite* and *Sandusky Wellness* offer little guidance,

as they represent opposite extremes. In *Top Flite*, the defendant produced no evidence of consent and relied on a single theory of showing consent that was subject to generalized class-wide resolution, while the *Sandusky Wellness* defendant produced hundreds of thousands of documents relating to consent that would have necessitated thousands of individualized determinations about putative class members. In short, neither case does much to identify the precise line where consent becomes a sufficiently individualized issue to prevent class certification on predominance grounds. And this is the true crux of the parties' dispute here. NeilMed contends it has "produced evidence" of consent. But Dr. Cooper argues that NeilMed has produced none (or, at the very least, not enough).

NeilMed offers five methods by which it says it received prior express invitation or permission from recipients before sending the P3990 Fax. Specifically, it says it received consent from: (1) "hundreds of professionals known to its founders"; (2) "in-person sales visits to doctors' offices"; (3) "in-person interactions at medical conventions"; (4) "direct inquiries from class members"; and (5) "return faxes" sent by various physicians in response to product sample offers. (*See* Opp'n, Doc. 66, #1546). The Court will consider in turn each category of evidence NeilMed offers in support of these theories of consent.

In terms of evidentiary showing, the first four of these methods are principally supported by NeilMed's discovery responses[6] and the deposition of

---

[6] Although the discovery responses NeilMed relies on appear to be unsworn, Dr. Cooper does not argue that the Court should not consider them for that reason at this juncture, and the Court considers that argument waived. Moreover, the substance of the responses is generally supported by the deposition testimony of Dr. Mehta.

Doctor Ketan Mehta, NeilMed's CEO and founder. (*Id.*). In its discovery responses, NeilMed asserts that it "obtained consent to send faxes … in a variety of ways since the company was started in 2000." (Def. Suppl. Resp. to Pl. Interrogs., Jacobson Decl. Ex. A, Doc. 66-2, #1597). For example, it says "[m]any customers," such as the founder's "fellow medical practitioners and their referrals," "consented to receive faxes orally." (*Id.*). It says that some of these practitioners also submitted consent declarations (discussed more thoroughly below), thereby "demonstrating that they previously provided Defendant with prior express invitation or permission to send them faxes." (*Id.*).

NeilMed writes that it also obtained consent from customers and potential customers at "trade shows and medical conventions throughout the United States and worldwide." (*Id.*). NeilMed "employs several full-time staff members" that represent NeilMed at these events, and reports that "[f]rom 2012 through 2016 alone, [NeilMed's] employees attended 521 tradeshows worldwide, including 343 tradeshows in the United States." (*Id.*). At these shows, attendees "provided their contact information and consent to receive faxes" by, for example, scanning a badge at NeilMed's booth, which "provide[d] Defendant with the registered participant's name and contact information." (*Id.*).

Other attendees, according to NeilMed, personally visited NeilMed's booth and "provided their contact information, including their fax numbers[,] … by filling out a form, so that they could receive samples, educational brochures and other information." (*Id.* at 1598). Others, still, left their business cards, including fax

16

numbers, "instead of taking the time to fill out a form by hand." (*Id.*; *see also* Mehta Dep., Doc. 61-1, #920 (testifying that NeilMed enters contact information into NetSuite after a "doctor has given the business card for communication")). According to NeilMed, it is "standard practice within the medical professional industry to expect a follow-up fax or email from a tradeshow exhibitor after a medical professional has provided their name and contact information." (Def. Suppl. Resp. to Pl. Interrogs., Jacobson Decl. Ex. A, Doc. 66-2, #1598).

Dr. Mehta, NeilMed's CEO, also provided further explanation on the topic. Though he could not match any of the recipient fax numbers with a specific doctor, Dr. Mehta insisted that he could do so if given names and photographs, as he knows "thousands" of doctors. (Mehta Dep., Doc. 61-1, #934–35). In addition, although Mehta did not know if one could determine from NetSuite (the software in which the fax numbers are stored) when or how NeilMed obtained a fax number, Mehta contends that at least some of the fax numbers were provided by doctors directly to him, to his co-founder, or to other employees. (*Id.*). Mehta also testified that NeilMed's "salespeople over the years have confirmed [with doctors] that [it's] okay to communicate via fax." (*Id.* at #917). Although he testified that he did not personally obtain permission from all the P3990 Fax recipients, he "ha[s] no doubt" that permission was received, because "that has been basically the practice for over 20 years." (*Id.*).

These discovery responses and corroborating testimony from NeilMed's founder strongly suggest that NeilMed built its list of fax recipients organically over

several years, and that thousands of individual physicians and/or their offices provided their contact information in a variety of ways and in different settings. As a result, factual and legal questions abound as to whether these individual putative class members in fact consented. This evidence thus favors a finding of a lack of predominance. *See Sawyer*, 2018 WL 4214386, at *4 (denying class certification where defendant's employees testified that it "[did] not purchase fax lists from third party brokers" but instead "'slowly built a collection of fax numbers of potential customers'" by attending trade shows, arranging meetings, contacting physicians, and the like).

Beyond that, NeilMed separately offers some documentary records that purportedly evince prior express invitation or permission. First, NeilMed points to 25 fax-back forms returned by physicians and physicians' offices in response to offers for NeilMed product samples. (Fax Back Forms, Jacobson Decl. Ex. B, Doc. 66-3, #1606–31). Most of these forms, like the fax-in-suit, offer free samples of NeilMed products, which physicians can request by selecting certain products, filling in their contact information (including fax number), and faxing back to NeilMed. (*See, e.g.*, *id.* at #1606, 1607, 1609). NeilMed says these forms show the senders' ongoing consent to receive faxes like the one here because the senders voluntarily provided their fax numbers. (Opp'n, Doc. 66, #1546). Finally, NeilMed offers 104 identical post-hoc declarations, including some from recipients of the challenged fax, whereby the declarants aver that their "office provided [NeilMed]

with its … facsimile number," understanding that "NeilMed would communicate" via that number. (*See, e.g.*, Consent Decl., Mot. Ex. G, Doc. 59-7, #677).

To be sure, these latter two forms of proving consent appear more susceptible to generalized determinations; or, at least, it does not appear that they would lead to an insurmountable number of individualized ones. Start with the faxback forms. The samples provided all look at least generally similar. Thus, a determination that a given form is, or is not, sufficient to provide consent may well apply across the board, even if NeilMed could come up with more than the 25 such forms it has provided to date. *See McCurley v. Royal Seas Cruises, Inc.,* 331 F.R.D. 142, 174 (S.D. Cal. 2019) ("Consent can be resolved on a classwide basis if consent was obtained in an identical *or substantially similar manner* from class members ….") (emphasis added); *Johansen v. One Planet Ops, Inc.*, No. 2:16-CV-00121, 2018 WL 1558263, at *5 (S.D. Ohio Mar. 5, 2018) ("Consent was given, if at all, through an online form. When a TCPA defendant obtains consent in a uniform manner such as an online form, consent can be resolved on a class-wide basis." (quoting *Toney v. Quality Res., Inc.*, No. 13 C 42, 2018 WL 844424, at *15 (N.D. Ill. Feb. 12, 2018))) (internal citation and quotation marks omitted).

That said, the faxback forms admittedly are akin to the evidence that the Sixth Circuit considered probative on predominance in *Sandusky Wellness. See* 863 F.3d at 469 (finding that "[i]dentifying solicited fax recipients through a form-by-form inquiry" was "sufficiently individualized to preclude class certification"). And the reason it did so is also instructive—even though the form issue could perhaps be

19

resolved *conceptually* on a class wide basis, the administrative difficulties involved in *implementing* the decision still troubled the court. That is, even once the determination was made as to the impact of the form, implementing that decision would have required the parties (or the court) to "manually cross-check[] 450,000 potential consent forms against the 53,502 potential class members." *See id.* at 465–66.

Those same types of concerns could well arise here. NeilMed raises the prospect that it has thousands of such forms, each of which presumably would need to be "cross-checked" against the list of fax recipients—at least if such forms suffice to show consent. And such a task becomes even more unwieldy if one takes NeilMed at its word: that continued searching of its "thousands of return faxes" would yield "additional tangible evidence of consent with respect to all those doctors, too." (Opp'n, Doc. 66, #1552). This is precisely the type of form-by-form inquiry the Sixth Circuit found to preclude class certification. S*ee Sandusky Wellness*, 863 F.3d at 469. Thus, the faxback forms cut at least somewhat against a finding of predominance here.

Now turn to the declarations. On their own, they likewise cut only marginally in favor of a finding that individual questions will predominate over common ones. To be sure, the declarations state that the signatory "specifically requested[] and gave permission" for NeilMed to send faxes, and hold out the challenged fax as "an example of the type of facsimile" that was "welcome and requested." (Consent Declaration, Jacobson Decl. Ex. D, Doc. 66-5, #1642–43). But the declarations are

not a silver bullet for NeilMed because, beyond stating that the declarant provided their fax number to NeilMed with the understanding that NeilMed would use it, the declarations do not specify precisely *how* and *when* each declarant consented. The language of the declarations (which are all identical) could encompass both a doctor who gave her business card to Dr. Mehta in 2012 and a doctor who swiped her badge at a NeilMed trade show booth in 2017. For that matter, any or all of the declarants may have simply provided their fax number using a "fax back" form like those discussed above, in which case the declarations become somewhat cumulative. In short, the declarations provide the Court with little guidance either way on whether the consent issue in this case interferes with a finding of predominance.

In the end, though, NeilMed has provided sufficient evidence for the Court to conclude that it is at least *likely* that the consent issue here will be individualized. As noted, NeilMed offered essentially unrebutted testimony that it grew its list organically based on individualized interactions with potential clients. As a factual matter, that creates almost a sort of presumption that the consent issue will be individualized. Against that backdrop, it would be incumbent upon Dr. Cooper to show why that is not the case. On that front, she offers nothing. She offers no evidence, for example, that NeilMed in fact purchased the fax numbers, nor does she have any meaningful basis to dispute NeilMed's account that it gathered numbers at some 571 trade shows, or through other individualized contacts.

Instead, Dr. Cooper seeks to raise doubt by pointing out what the evidence does *not* include. For example, she correctly notes that NeilMed identified no

salespeople who allegedly confirmed consent orally, nor does it provide any records reflecting which doctors swiped their badges at trade shows, or other like evidence.

But the fact that NeilMed might have submitted more or different evidence does not doom its opposition to certification. And, contrary to Dr. Cooper's argument that NeilMed has "no evidence" of permission, (Reply, Doc. 70, #3332), NeilMed has marshalled at least some evidence that members of the putative class consented in a variety of ways over several years, including by leaving their contact information at trade shows, responding to sample offers, and giving their contact information directly to NeilMed employees. NeilMed's CEO testified that, although he did not personally obtain consent from each fax recipient, he has "no doubt" that NeilMed's "salespeople over the years … confirmed that [it's] okay to communicate via fax, because fax is the main system via which doctors communicate." (Mehta Dep., Doc. 61-1, #917). This, he says, "has been basically [NeilMed's] practice for over 20 years." (*Id.*). That testimony, by itself, is sufficient to raise at least a likelihood that a substantial number of individualized inquiries will be necessary. And, absent competing evidence, that suffices to defeat predominance.

Most of Dr. Cooper's arguments to the contrary incorrectly focus on whether NeilMed's evidence of consent will hold up when measured against substantive TCPA law. In response to Mehta's testimony about NeilMed's "practice" of confirming that it's "okay to fax," for example, Dr. Cooper counters that "a long-standing practice of communicating with doctors via facsimile hardly amounts to clear-and-convincing evidence that the doctors have given prior, express permission

22

to receive [faxed] advertisements." (Mot., Doc. 59, #507). Dr. Cooper likewise urges that none of NeilMed's fax-back forms nor consent declarations constitute prior express permission for purposes of the TCPA because none of the documents explicitly mention consenting to receive faxed advertisements. (Reply, Doc. 70, #3326–27). Thus, Dr. Cooper says, none of the senders could have "underst[ood] that by providing a fax number, [they were] agreeing to receive faxed advertisements." (*Id.* at #3326 (quoting In re Rules and Regulations Implementing the Telephone Consumer Protection Act, 68 Fed. Reg. 44144, ¶¶ 135, 136 (July 25, 2003))).

To be sure, a defendant cannot defeat predominance by raising factual issues having no bearing at all on the salient legal question. *See, e.g.*, *Brigadoon Fitness*, 29 F.4th at 846–47 (explaining that, if the defendant's "claim of permission were based on a legally flawed definition, the company's argument regarding predominance would fail"). For example, even a mountain of documentary evidence proving that every single putative class member unambiguously consented to receive faxed advertisements could not carry the day for NeilMed if that evidence showed they did so only *after* having received the challenged fax. In other words, if the evidence that the defendant produces to support its claim that consent will require an individualized determination is legally *irrelevant* to that issue, that evidence would do little to interfere with a plaintiff's showing of predominance.

The evidence NeilMed has submitted, however, is not per se irrelevant. Indeed, contrary to Dr. Cooper's argument, NeilMed's longstanding practice of communicating with doctors via fax very well *might* satisfy the definition of prior

express permission as articulated by various courts. *See Bais Yaakov of Spring Valley v. ACT, Inc.*, 12 F.4th 81, 90 (1st Cir. 2021) ("FCC rules (unchallenged by either side) provide that in gauging whether express permission was provided, we consider the understanding of the recipient." (citing In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14,014, 14,129 (2003) ("Express permission to receive a faxed ad requires that the consumer understand that by providing a fax number, he or she is agreeing to receive faxed advertisements."))). To ultimately resolve that question, the Court would require additional context about the circumstances in which each physician consented. And there lies the rub—it is this very need for context that creates the predominance hurdle Dr. Cooper stumbles on here. *See id.* at 92 ("In short, even if we assume that these documents are advertisements, [defendant] would not incur liability if in the context of a particular relationship a request for [defendant's] publications was clearly understood as an invitation to fax what was faxed."); *Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1100 (11th Cir. 2019) ("Although express permission requires a 'clear[] and unmistakabl[e] communicat[ion],' it does not require that a recipient state specifically that his permission includes faxed advertisements."); *cf. Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 622 (3d Cir. 2020) ("The District Court was thus correct in finding that … [plaintiff] provided business cards with its fax number to drug company representatives, thereby giving express consent, invitation, and permission to receive related information, and thus in finding that the two faxes were solicited."); *Robert W.*

*Mauthe, M.D., P.C. v. Millennium Health LLC*, No. CV 18-1903, 2020 WL 2793954, at *7 (E.D. Pa. May 29, 2020) (considering first whether "the plaintiff gave the defendant express consent to send the fax through 'voluntary provision' of the plaintiff's fax number" and, if so, whether the challenged fax "relate[d] to the reason the number was provided").

More broadly, the Court's mandate at this juncture is not to prejudge the success of NeilMed's defense theories. Instead, "the office of a Rule 23(b)(3) certification ruling is … to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'" *Amgen*, 568 U.S. at 460. Thus, the Court's duty is only to determine whether the issue of consent is a common issue susceptible to generalized proof, or an individualized issue incapable of efficient class-wide resolution. "[I]t is not the final merits of the permission inquiry that matter for Rule 23(b)(3) purposes; it is the method of determining the answer and not the answer itself that drives the predominance consideration …." *Brigadoon Fitness*, 29 F.4th at 845; *see also Top Flite*, 843 F.3d at 1124 (the predominance inquiry requires a court to assess whether the pertinent legal and factual questions are "subject to generalized proof, and thus applicable to the class as a whole"). In other words, "[w]hat matters [at this stage] is the *type* of evidence that the parties will submit to prove and disprove the defense." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225 (11th Cir. 2016) (emphasis added). As noted above, here the evidence on consent likely will consist of individualized information about context. That counsels in favor of finding a lack of predominance.

For similar reasons, Dr. Cooper is incorrect to suggest that a defendant at this stage must "set[] forth specific evidence showing that a *significant percentage* of the putative class consented." (Reply, Doc. 70, #3337 (quoting *Dr. Robert L. Meinders D.C., Ltd. v. Emery Wilson Corp.*, No. 14-cv-596, 2016 U.S. Dist. LEXIS 80570, *19–*20 (S.D. Ill. 2016))). Dr. Cooper offers no appellate precedent (nor even any in-circuit precedent) for this proposition. To the contrary, the Seventh Circuit (which encompasses the district court on which Dr. Cooper relies) recently rejected just such a requirement. *Brigadoon Fitness*, 29 F.4th at 848 (7th Cir. 2022) ("[Plaintiff's] reliance on district court cases to establish a rule that defendants *must* present evidence of permission given by a 'significant percentage' of the proposed class to defeat class certification reflects an over-reading of those cases."). That some, or even most, of NeilMed's affirmative defenses may ultimately fail does not make the case any more amenable to the class action treatment; rather, "courts have acknowledged that the predominance-defeating evidence of consent presented by the defendant 'may not all hold up' when reviewed on the merits." *Licari Fam. Chiropractic Inc. v. eClinical Works, LLC*, No. 8:16-CV-3461-MSS-JSS, 2019 WL 7423551, at *10 (M.D. Fla. Sept. 16, 2019) (citing, among others, *Brodsky v. HumanaDental Ins. Co.*, 910 F.3d 285, 292 (7th Cir. 2018)).

Thus, NeilMed need not "prove" consent at this preliminary stage (as Dr. Cooper seems to suggest). It need only offer evidence sufficient to show that it is likely that the consent issue here will require a substantial number of individualized determinations. And the Court finds that it has done so by

presenting "sufficient, non-speculative evidence that a bona fide issue of consent exists." *Sawyer*, 2018 WL 2425780, at \*9. Thus, Dr. Cooper must, consistent with her burden under Rule 23, "come up with something (whether argument or evidence) to persuade th[e] Court that those individualized consent issues would not drive this litigation." *Id.* Dr. Cooper has failed to do so.

In a further effort to sustain her burden under Rule 23, Dr. Cooper argues that there exists "class-wide evidence that NeilMed did not obtain prior express invitation or permission from the 54,938 successful recipients of the P3990 Fax." (Mot., Doc. 59, #504). To support that argument, Dr. Cooper points to the depositions of three NeilMed employees: Dr. Mehta, Srikanth Pai, and Jeffrey Davis. According to Dr. Cooper, certain portions of these employees' deposition testimony show that NeilMed "did not attempt to … obtain [] permission" from recipients of the P3990 Fax before transmitting it. (*Id.*). For example, Srikanth Pai, NeilMed's Director of Marketing, testified that he did not know whether, prior to the P3990 broadcast, "anyone at NeilMed call[ed] any of the doctors seeking permission to send" it. (*Id.* (quoting Pai Dep., Doc. 62-1, #1123)). And Jeffrey Davis, part of the "graphics team," testified that he was not "instructed to call [anyone]" to obtain permission for the fax. (*Id.* (quoting Davis Dep., Doc. 60-1, #797)).

But Dr. Cooper over-reads these depositions. At best, these excerpts show that none of the deposed employees themselves reached out to physicians or physicians' offices regarding the P3990 Fax. And, apart from failing to establish that no one *else* at NeilMed reached out regarding the P3990 Fax specifically, these

excerpts fail to consider that prior express permission, once given, can continue until revoked. *See Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959, 966 (7th Cir. 2020) ("Both *CE Design* and *Travel 100 Grp.*, as well as the FCC's regulations, imply that a party may consent on an ongoing basis to faxed advertisements. Given the impracticality of any other rule, we make our ruling explicit: Provided a customer gives consent …, we will presume that the customer has given permission on an ongoing basis to fax advertisements.") (citations omitted). Thus, the sender of a fax need not obtain permission for each fax individually, and these depositions fail to constitute generalized proof of an absence of consent.

In sum, the Court concludes based on the record here that individualized factual determinations about if, when, and how certain putative class members (i.e., fax recipients) consented would likely become the "driver" of this litigation. Thus, Dr. Cooper has failed to establish the predominance of common questions as Federal Rule of Civil Procedure 23(b)(3) requires.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Dr. Cooper's Motion for Class Certification (Doc. 59).

**SO ORDERED.**

August 9, 2022
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**